Curtis McDONALD, Appellant,

v.

Yvonne TRIHUB, Appellee.

No. S–12317.

Supreme Court of Alaska.

Dec. 28, 2007.

Deborah Burlinski, Burlinski Law Office, LLC, Anchorage, for Appellant.

Rhonda F. Butterfield, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I.  INTRODUCTION

This appeal arises out of two overlapping child support proceedings—the first culminating in an administrative decision and the second in a superior court order—that established different levels of child support for a father.  The father appeals the superior court's decision, contending that the court was collaterally estopped from rendering findings different from those established in the administrative decision and that the court's order was an impermissible retroactive modification of child support. He also argues that the court erred in concluding

that he did not have shared physical custody of his son, in establishing his child support obligation, in refusing to reduce his obligation on account of his disability, and in awarding attorney's fees. Because the father affirmatively waived his right to assert collateral estoppel and because the parties chose to allow the court to decide each year of the father's support obligation, there was no valid support order in effect at the time of the court's order and it was therefore not an impermissible retroactive modification of support. Because the court's decisions establishing the father's income and refusing to reduce his obligation on account of his disability are supported by the record, we affirm the superior court's decision in all respects. Finally, because the father concedes that the divorce exception does not apply to the facts of this case, we affirm the court's award of attorney's fees under Civil Rule 82.

## II. FACTS AND PROCEEDINGS

Curtis McDonald and Yvonne Trihub were involved in a relationship but never married. They had one child, Gideon, born in Anchorage in 1992. Six months after Gideon was born, the parties separated. Yvonne and Gideon lived in Oregon during the mid 1990's. During that period and until August or September 1999, Curtis paid Yvonne some level of child support, ranging from $275 to $475 a month. The parties did not seek or obtain a support or custody order. In 1999 Yvonne and Gideon returned to Alaska and resided with Curtis until May 2000.

Central to this appeal are two parallel proceedings regarding Curtis's child support obligation. The first began in October 2003, when Yvonne initially applied to the Child Support Services Division (CSSD) for child support services. After CSSD issued initial support recommendations, Curtis requested administrative review which resulted in CSSD issuing an amended support order in August 2004. The order established Curtis's ongoing support obligation at $932 per month and found him to be $10,252 in arrears for the period October 2003 through August 2004. Curtis appealed the amended order and requested an administrative hearing, asserting that CSSD had overestimated his

income and failed to calculate his support obligation based on shared custody. An administrative hearing was conducted in November 2004.

In December 2004 CSSD issued a "post-hearing brief," finding that Curtis had custody of Gideon for forty percent of the time in 2003 and thirty-six percent of the time in 2004. The Office of Administrative Hearings (OAH) subsequently sought additional evidence regarding Yvonne's income and directed CSSD to revise its initial calculations.

In January 2005, before completion of the administrative proceedings, Curtis filed a complaint for joint custody in the superior court. The complaint stated that there was an open CSSD action and that "[a]dministrative appeals are pending in that case." Yvonne counter-claimed and asked the court to reduce the amount of child support arrears to judgment.

In November 2005 the parties entered a child custody settlement agreement. They agreed to share joint legal custody, while primary physical custody was awarded to Yvonne. The custody settlement was approved by the court, though the support issues remained unresolved.

On April 7, 2006, OAH Administrative Law Judge Kay Howard issued a decision and order (the administrative decision) in the CSSD proceedings. The administrative decision adopted CSSD's revised calculations of Curtis's income and determined Curtis's support obligation based on a finding of shared custody. The administrative decision ultimately found Curtis liable for child support in the amount of "$208 per month from October 2003 through December 2003, and $221 per month, effective January 2004, and ongoing."

On April 17, 2006, ten days after the administrative decision, Superior Court Judge Sen K. Tan conducted a hearing on child support. At the conclusion of the hearing, the court issued verbal findings, concluding that Yvonne had primary physical custody of Gideon during the years in question and imputing income to Curtis for the purpose of calculating his support obligation. Judge Tan

denied Curtis's subsequent motion for reconsideration.

On May 8, 2006, Judge Tan issued a final order concluding that Yvonne had primary physical custody of Gideon during 2000–2002, 2004, and 2005, calculating Curtis's support obligations from 2000 forward using a wage of twenty dollars per hour, and setting Curtis's support obligation for May 2000 forward. Curtis's monthly support obligation was determined to be approximately $560. The court subsequently awarded Yvonne $1,404 in attorney's fees.

Curtis appeals the superior court decision and claims the court erred by (1) failing to apply collateral estoppel to the administrative decision; (2) failing to properly apply Alaska statutes regarding CSSD's "separate authority"; (3) modifying his support obligation retroactively; (4) imputing income retroactively; (5) finding Yvonne exercised primary physical custody of Gideon from 2000 through 2002 and 2004; (6) establishing his ongoing support obligation incorrectly and failing to reduce his current obligation on account of his disability; and (7) awarding Yvonne attorney's fees.

### III. STANDARD OF REVIEW

■ We will reverse a child support award only if the trial court abused its discretion or applied an incorrect legal standard.[1] The question of whether the superior court followed the proper method of calculating child support is a question of law that we review de novo.[2]

■ The superior court's factual findings regarding a party's income for calculating

---

child support[3] will be overturned only if clearly erroneous.[4]

■ While we review an award of attorney's fees for abuse of discretion,[5] the determination of which statute or rule applies to an award of attorney's fees is a question of law that we review de novo.[6]

### IV. DISCUSSION

#### A. The Superior Court Correctly Declined To Apply Collateral Estoppel to the Administrative Decision.

■ Curtis's first argument is that the superior court erred as a matter of law in failing to apply the doctrine of collateral estoppel to the administrative decision. Yvonne alleges that Curtis waived this argument by failing to include it in his points on appeal. While the issue is not listed in his points on appeal, we have previously recognized that where a party raised the claim before the trial court, fully briefs the issue on appeal, and the issue can be "effectively address[ed] ... without the need to review untranscribed portions of the electronic record," we may still undertake review.[7] Here, Curtis's fourth point on appeal alleged that the court erred by "failing to review and properly consider the findings of the Administrative Hearing Officer ... wh[o] made findings on the same issues involved in this case." This provided adequate notice of Curtis's first argument. Moreover, the issue was addressed by the superior court below and the argument is listed under a separate heading and discussed in Curtis's appellate brief. Under these circumstances, we may consider this issue.[8]

---

1. *Beaudoin v. Beaudoin*, 24 P.3d 523, 526 (Alaska 2001).

2. *Spott v. Spott*, 17 P.3d 52, 55 (Alaska 2001).

3. *Koller v. Reft*, 71 P.3d 800, 804 (Alaska 2003).

4. *Dunn v. Dunn*, 952 P.2d 268, 270 (Alaska 1998).

5. *Valley Hosp. Ass'n v. Brauneis*, 141 P.3d 726, 729 (Alaska 2006).

6. *Koller*, 71 P.3d at 808.

7. *Alderman v. Iditarod Props., Inc.*, 104 P.3d 136, 141 n. 17 (Alaska 2004); *See* Alaska R.App. P. 204(e).

8. *See Donnybrook Bldg. Supply Co. v. Alaska Nat'l Bank of the North*, 736 P.2d 1147, 1149 n. 6 (Alaska 1987) (noting that where issue raised before trial court and fully briefed by both parties, appellant's failure to include it in points on appeal did not preclude appellate review); *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985) (noting court may consider theory not expressly presented where "it is not dependent on any new or controverted facts" and where "it is closely related to ... trial court

■ Collateral estoppel "bars relitigation, even in an action on a different claim, of all issues of facts or law that were actually litigated and necessarily decided in a prior proceeding." [9] In order for collateral estoppel to apply, the claim must be asserted against a party or one in privity with a party to the first action.[10] Where a party fails to assert the claim of collateral estoppel against the opposing party, it may be considered waived.[11]

■ In this case, the superior court raised the issue of whether collateral estoppel applied. Judge Tan asked counsel for both parties what years of custody and child support were at issue; the parties specifically requested the court to issue a determination for every year. In so doing, they plainly waived their right to later assert collateral estoppel.[12]

At the beginning of the court hearing Judge Tan engaged counsel in a colloquy on the legal effect of the administrative decision, which did not address the period of time from May 2000 to 2002, but which had adopted the CSSD findings for 2003 forward. Curtis's counsel, Deborah Burlinski, initially requested that the court "follow" the findings of the administrative decision. Judge Tan then asked Yvonne's attorney, Rhonda Butterfield, whether the court should decide support calculations for all years, including the time period covered in the administrative decision: "[M]y question to Ms. Butterfield is, look, do I get to redo that or isn't that something that if you disagree with you should have taken an administrative appeal?" Ms. Butterfield clarified that the time for filing an appeal of the administrative decision had not yet run and stated that she did not want "inconsistent decisions."

Judge Tan then summarized his concerns on the issue:

[O]n the one hand, I want to give CSSD deference, but on the other hand I want to make sure that, you know, I'm doing something so that we don't come up with an inconsistent decision. What I want to be clear up front is this ... I am willing to go ahead and make a decision for all the years. However, if either party wants to take the position, Judge, we don't like your decision, okay, then we're going to argue collateral estoppel and take an administrative appeal and probably get another judge, then I'm going to say, I'm not going to waste my time doing '03, '04 because then basically we could essentially have what I would call a mess and I'd rather not do that and just say, you know, they're two different tracks. You can either pick the time track or for '03, '04, you can select another track and I'm willing to let it move on through the appellate process including an administrative appeal and so we don't have inconsistent decisions. That's what I want to avoid. So I would like to clarify with counsel what your position is. Do we want to do '03, '04 or should I just do ... 2000, 2001, 2002, and 2005 onwards?

Butterfield: Your Honor, we think you should do all of it.

Court: Okay. So essentially I just want to make clear.... Is your position regardless of what I do it's b[i]nding?"

Butterfield: Correct.

Court: The parties will not seek—how can I say—an administrative appeal.

Butterfield: Correct.

. . .

Court: Ms. Burlinski, are you in agreement with that?

theory and could have been gleaned from ... pleadings").

9. *Wall v. Stinson*, 983 P.2d 736, 740 (Alaska 1999) (internal quotations omitted).

10. *Id.* (internal citations omitted).

11. *Cf. In re Pac. Marine Ins. Co. v. Harvest States Coop.*, 877 P.2d 264, 267 n. 1 (Alaska 1994) (considering whether party waived issue of collateral estoppel by raising it for the first time on appeal). *See also* 47 AM.JUR.2D *Judgments* § 637

(2007) ("The failure to plead or raise in a timely manner matters calling for the application of the doctrines of res judicata and collateral estoppel generally is regarded as a waiver.").

12. *See Milne v. Anderson*, 576 P.2d 109, 112 (Alaska 1978) (finding waiver, defined as "intentional relinquishment of a known right," where appellant failed to protest actions that later formed basis of appellant's lawsuit) (internal citations omitted).

Burlinski: Yes, Your Honor.

Thus, the parties agreed to allow the court to decide each year at issue, including those covered in the administrative decision. The parties' statements, when viewed in light of Judge Tan's plainly expressed concerns, make clear that both parties intended to allow the superior court to independently determine each year of child support, including the time period covered in the administrative decision. Because Curtis affirmatively and explicitly agreed to proceeding in the superior court, instead of maintaining that collateral estoppel applied to the obligation amounts established in the administrative decision, he is precluded from asserting collateral estoppel now.

## B. Curtis Waived His Statutory Argument.

Curtis next claims that the court violated Alaska statutes by not giving proper legal effect to the administrative decision. He argues that CSSD is a separate "tribunal" under AS 25.25.102 [13] and AS 25.25.205(a),[14] and that absent an appeal of the administrative decision, the court must give effect to the "legislature's intent" recognizing their jurisdiction.[15]

■ For the reasons discussed above, we again conclude that Curtis affirmatively and explicitly waived this argument when he appeared and asked the superior court to proceed to decide support obligations for all years.

There is a second basis upon which to conclude that Curtis has waived this point: It is not sufficiently addressed to merit appellate review. We have previously held that a claim is waived where an appellant makes only vague allegations to the trial court, fails to raise it in his points on appeal, and gives cursory treatment to the issue on appeal.[16] Here, Curtis never made this argument to the trial court; moreover, his appellate argument on this point is largely conclusory and devoid of any relevant citations. In addition, only Curtis's fourth point on appeal, which alleged that Judge Tan "fail[ed] to review and properly consider the findings of the Administrative Hearing Officer on the same issues involved in this case" could be considered to have put Yvonne on notice of this argument. But point four is sweeping and non-specific, and nowhere does it suggest a statutory challenge to the trial court's decision. Finally, unlike the collateral estoppel issue, which was discussed before the superior court, nowhere below did Curtis allege that either statutory section was dispositive of the court's treatment of the administrative decision. We therefore conclude that this argument is waived.

## C. The Superior Court's Order Was Not an Impermissible Retroactive Modification of Child Support.

■ Curtis next contends that by establishing child support amounts that differed from those established in the administrative decision, the superior court engaged in an impermissible retroactive modification of support.

Alaska Civil Rule 90.3(h)(2) prohibits the retroactive modification of child support.[17] The rule precludes both decreases and increases of a child support award that would be effective before the date that a motion for modification is served on the opposing par-

---

**13.** AS 25.25.102 provides: "The superior court and the child support services agency are the tribunals of this state."

**14.** AS 25.25.205(a) provides: "A tribunal of this state issuing a child support order consistent with the law of this state has continuing, exclusive jurisdiction over a child support order. . . ."

**15.** It is unclear why neither party in this case sought to abate the superior court action under AS 25.27.135, which provides: "If the same causes of action concerning a duty of child support are pending concurrently in court and be-

fore the agency, the second action filed may be abated upon the motion of a party or the agency."

**16.** *See Conkey v. State, Dep't of Admin., Div. of Motor Vehicles,* 113 P.3d 1235, 1237 n. 6 (Alaska 2005).

**17.** Rule 90.3(h)(2) provides: "Child support arrearage may not be modified retroactively. . . . A modification which is effective on or after the date that a motion for modification . . . is served on the opposing party is not considered a retroactive modification."

ty.[18] However, where no child support order is in effect for the relevant period, the use of Rule 90.3 to establish child support does not violate the prohibition on retroactive modification.[19]

Under the circumstances present here, we conclude that Rule 90.3(h)(2)'s ban on retroactive modification is inapplicable because there was no valid support order in effect at the time of the superior court order.[20] As discussed above, neither party had exercised its right to appeal the administrative decision,[21] and both parties requested that Judge Tan issue a support order encompassing each and every year of the parties' support obligations. The decision to proceed in the superior court on all the years thereby prevented the administrative decision from taking effect.[22]

Because the administrative decision was only ten days old and the time for filing an administrative appeal had not yet lapsed, and because both parties agreed that the court could go forward and decide support obligations for all years, we conclude that no valid support order was in effect at the time the superior court acted. The superior court's order was therefore the effective support order in this case and was not an impermissible retroactive modification of child support.

### D. The Court Did Not Err in Concluding that Yvonne Had Primary Physical Custody of Gideon in 2000–2002 and in 2004.

[12] Curtis next challenges the court's determination that Yvonne had primary physical custody of Gideon from May 2000 through 2002 and in 2004.[23] He asserts that the court erroneously relied on the testimony of Gideon's babysitter and failed to give sufficient weight to 2003 and 2004 calendars that he contends reflect the amount of time he spent with Gideon. We conclude that Judge Tan's determination was adequately supported by the evidence.

Under Alaska Civil Rule 90.3(b), support obligations of parents who share physical custody of their children are established by calculating the amount each parent would owe assuming that the other parent had primary physical custody and multiplying that amount by the percentage of time the other parent has primary physical custody. The difference, augmented by fifty percent, is the amount of support owed. Civil Rule 90.3 provides that a parent has "shared physical custody" for the purposes of calculating child support if a child resides with that parent for at least thirty percent of the year, or 110 nights.[24]

Yvonne testified that beginning in May 2000, she had primary physical custody of Gideon and that Curtis had visitation for approximately two two-week periods in the summer and every other weekend throughout the school years. She testified that while the parties attempted a shared custody arrangement in the spring of 2001, Curtis routinely failed to take Gideon when he was supposed to, that "it became to where it was mostly he was with me," and that the arrangement dissolved by November 2001. She also stated that while Curtis was supposed to have visitation with Gideon every other weekend, Curtis would routinely pick

---

18. *Yerrington v. Yerrington*, 933 P.2d 555, 558 (Alaska 1997).

19. *Spott v. Spott*, 17 P.3d 52, 55 (Alaska 2001).

20. *See Kilpper v. State, Dep't of Revenue, Child Support Enforcement Div.*, 983 P.2d 729, 734, n. 17 (Alaska 1999) (noting that altering child support arrearage for period where no child support order in effect not impermissible retroactive modification).

21. AS 25.27.220, which provides for appellate review of CSSD decisions, allows for judicial inquiry into whether there was a prejudicial abuse of discretion, and also provides that the superior court may exercise its independent judgment on the evidence, augment the agency record in whole or in part, or hold a hearing *de novo*.

22. *See State, Dep't of Revenue., Child Support Enforcement Div. v. Button*, 7 P.3d 74, 76 (Alaska 2000) (party's appeal of agency's informal conference decision prevented support order from becoming final order for purposes of ban on retroactive modification).

23. The parties shared physical custody of Gideon in 2003.

24. Alaska R. Civ. P. 90.3(f) and cmt. V(A).

Gideon up Saturday morning rather than Friday night.

As Judge Tan noted, Curtis testified to a similar schedule. Curtis stated that for "most of 2000" Gideon and his mother lived with him in his house, but that after she moved out, he had Gideon for "weeks at a time," or for roughly forty-five out of sixty days of summer 2000. Curtis admitted that beginning in the fall of 2000 he saw Gideon "probably every other weekend" and would pick him up on "Friday night or Saturday morning" and return Gideon to school on Monday morning. Curtis also testified that he and Yvonne followed this same pattern for 2001 and 2002, with Curtis having custody approximately every other weekend and forty-five out of sixty days in the summer.

While select portions of Curtis's testimony and that from other witnesses suggested he had custody of Gideon more frequently, Judge Tan could have reasonably afforded more weight to the similarity of Yvonne and Curtis's recollections. Moreover, the testimony of the other witnesses differed substantially from that which Curtis and Yvonne recalled: Dylan Bales, a family friend, testified that Gideon was at Curtis's full-time in 2000–2002. But on cross-examination it became apparent that Bales was more likely referring to the time period 2002–2003, which more closely tracks the time frame the parties stipulated that they shared custody. Curtis's wife, Sandy McDonald, testified that Gideon lived with Curtis nearly full-time and year-round from May 2000 until September 2002 and only "occasionally" visited with his mother. Judge Tan aptly noted that this testimony presented a "totally different picture" than that Curtis offered.

To the extent that there was a close question, the court found the testimony of Yvonne's babysitter Miriam Velasquez ("Tia") the "tie-breaker." Yvonne testified that Tia became Gideon's babysitter in 2000. Yvonne stated that beginning in 2001 and for the next four years she worked nights at Carpentier's Lounge, that Tia babysat for Gideon, and that Yvonne picked Gideon up from Tia's home after finishing work. When the court called Tia as a witness, she testified that she began watching Gideon "many years ago ... maybe four years. Five ..." and that she had been babysitting him for a "long time." She testified that Yvonne worked nights and that Gideon would sleep at her house until Yvonne picked him up in the middle of the night, testimony which squarely supports Yvonne's recollection of the custody arrangement during this period.

Curtis next claims that a 2004 calendar maintained by Sandy McDonald, which covered only January through October 2004, revealed that he had sufficient overnights with Gideon to qualify for shared custody of Gideon that year. He relies heavily on "inconsistencies" in Yvonne's testimony at the administrative hearing which he claims supports the accuracy of the 2004 calendar. This reliance is misplaced, because the administrative transcript is not included in our appellate record and because Curtis's questioning of Yvonne on the subject at the April 2006 court hearing indicates only that she stipulated that the parties shared custody in *2003*. Moreover, while Curtis testified that his wife's 2004 calendar was accurate, his testimony on cross-examination revealed that he had spent only ninety-two nights with Gideon through October 2004 (the last month the calendar was maintained). Yvonne testified that Curtis had Gideon for approximately nine additional nights between November and December 2004 for a total of only 101 nights in 2004. Curtis asserts that the calendar reflects Gideon spent more time with him than his testimony indicated, particularly over the Fourth of July holiday. But this claim is not clearly established upon a review of the calendar and is directly contradicted by Yvonne's testimony that she had custody of Gideon over that same weekend.

In light of Curtis's testimony corroborating Yvonne's recollection of events, the court's unique position to judge the credibility of the witnesses,[25] and the court's finding that Yvonne had a "good recollection of where Gideon was most of the time during these years," we conclude that the superior court

25. *Parker v. N. Mixing Co.*, 756 P.2d 881, 892 (Alaska 1988) ("It is the function of the trial court, not this court, to judge witnesses' credibility and to weigh conflicting evidence.").

did not err in finding that Yvonne had primary physical custody.

### E. The Court Did Not Err in Determining Curtis's Income for the Purpose of Establishing His Retrospective Support Obligation.

■ Curtis next asserts that the superior court erred in establishing his retrospective support obligation based upon a wage of twenty dollars per hour for a "skilled mechanic." He claims that the court used this figure as imputed income but made no finding that he was underemployed. Contrary to Curtis's contention, the court's decision to approximate income was not based on a finding that Curtis was underemployed, but rather was an effort to estimate Curtis's income accurately in light of the confusing and non-credible nature of the evidence Curtis had presented. We conclude that the decision to do so was reasonable.

■ A trial court must apply the methodology of Rule 90.3 to establish the amount due to a custodial parent for child support during periods not covered by a support order.[26] The court's calculation of income for the purposes of establishing the amount of support owed should be a "reasonable assessment" of the obligor's earning capacity.[27]

Curtis contends that in establishing the retrospective award his actual income should have been used,[28] and that the court's use of the hourly wage was error. Our recent case law provides that actual income is an acceptable basis for establishing past support "accruing over a relatively short duration,"[29] but here the superior court was confronted with establishing Curtis's support obligations over a six-year period. Moreover, we have recognized that a trial court may estimate income for the purpose of calculating support where no other accurate or credible information is available.[30] In this case, the court attempted to approximate Curtis's income amid evidence that was at best contradictory and inchoate, and at worst misleading.

Judge Tan agreed with the administrative decision in concluding that Curtis's tax returns were not consistent with his bank records.[31] Judge Tan found that Curtis's cash flow likely underestimated his income, that Curtis "was not careful about keeping business records," and that the various income numbers presented were "guesstimates at best." The court also recognized that while Curtis was doing "favors" for friends by providing labor for excavations in the form of a bartering system, he provided no written record of these transactions. Judge Tan ultimately concluded that the court did not have a "complete picture of Mr. McDonald's actual income."

The court's rejection of Curtis's proffered income evidence is perhaps best justified because the evidence varied widely and three different fact-finders have found it confounding, unreliable, or both. At the April 2006 court hearing, Curtis's counsel contended that Curtis's income from "2000 until present" was in the "$25,000 range." But Curtis's tax returns reflected a much lower figure—his 1999 adjusted gross income was $9,612 and his 2000 income was $8,307. At no time does Curtis explain the discrepancy between these figures. CSSD recognized the discrepancy and rejected Curtis's 2003 tax return, which reflected a business income of $11,186, and instead initially calculated Cur-

---

**26.** *See Vachon v. Pugliese,* 931 P.2d 371, 382 (Alaska 1996).

**27.** *Kowalski v. Kowalski,* 806 P.2d 1368, 1372 (Alaska 1991).

**28.** *Spott v. Spott,* 17 P.3d 52, 56 (Alaska 2001) (citing *Crayton v. Crayton,* 944 P.2d 487, 490 (Alaska 1997) (requiring retrospective support be based on actual income)).

**29.** *Duffus v. Duffus,* 72 P.3d 313, 321 (Alaska 2003).

**30.** *Benson v. Benson,* 977 P.2d 88, 91 (Alaska 1999) (affirming order imputing income based on estimates of party's bank records and rejecting party's income information where tax returns not credible, testimony non-responsive and contradictory, and party failed to keep accurate income records).

**31.** The administrative hearing officer noted that Curtis's tax return was inconsistent with his other financial documents and his testimony and concluded that it "[did] not accurately reflect his income and expenses."

tis's 2003 obligation based on the total amount of deposits ($72,897) made to his business checking account. Following the administrative hearing, CSSD rejected the business-deposit methodology and instead calculated Curtis's obligations on the total amount of personal checks Curtis withdrew from his business for personal expenses— $25,730.17 in 2003 and $24,101.18 in 2004. The administrative decision subsequently concluded that this latter method was "atypical, but it is the best evidence of [Curtis]'s income for child support purposes." The decision also noted that "the tax return . . . does not accurately reflect [Curtis]'s income and expenses" and was "not consistent with his other financial documents and testimony"; it also recognized that there were many "unanswered questions in [Curtis]'s financial documents."

In considering how to determine most accurately Curtis's support obligation, Judge Tan noted that it would be nearly impossible to "go back and recreate" Curtis's income from the information presented. The court chose to approximate Curtis's income using a wage of twenty dollars per hour, a decision that was also adequately supported by the evidence.[32] Testimony established that Curtis owned and operated a business buying and selling used motor homes, that he worked as an automobile mechanic repairing and upgrading the motor homes for resale, and that as recently as 2004 he held a business license for "auto repair and sales." Evidence established that the mean wage for automotive service technicians and mechanics in Anchorage was $20.51 per hour. Curtis also maintained a commercial driver's license and has performed some excavation work, including putting water lines in for a housing development and laying foundations in the summer of 2004. Evidence established that the mean wage for "machine operators, exca-

vating" was $19.32 per hour. In light of this evidence, Judge Tan's use of a wage of twenty dollars per hour as an estimate of Curtis's income was reasonable.[33]

Curtis suggests Judge Tan should have invited him to submit additional information to "clear up any discrepancies." But we have repeatedly recognized that parties who fail to present sufficient evidence to the court cannot later object on the basis of inadequate evidence.[34] Indeed, Curtis's own testimony revealed his disinclination to assist the court in obtaining a more accurate picture of his finances. While being questioned about his bank accounts Curtis responded, "[s]omething that's—you know, that's bothering me right now is I've already gone through all this in front of a judge under oath. I've spent two days and this has all been done. So are we going to go do two more days of this?"

Curtis's testimony also indicated that he had little memory of or willingness to discuss his prior cash flow, income, and bookkeeping practices. Curtis was asked about the large discrepancies between his business bank statements and his tax returns. When asked which were accurate, the tax returns or the bank statements, Curtis asserted that the number on his tax return was the correct one, but he could not explain why the figures differed so substantially. He repeatedly responded "I don't know" and added "you'd have to ask the accountant." He was unable to testify whether there was anything erroneous about his bank account statements, why his bank statements and business account statements regularly differed from the information provided on his tax returns, and if or how much he was paid for an excavation job he performed in 2004. He also stated that he kept his own books for his business, but that he "didn't really keep any records," he "didn't see any reason why" he needed to

---

32. *Cf. Koller v. Reft*, 71 P.3d, 800, 805 (Alaska 2003) (requiring court to make specific findings to support determination of adjusted income under Rule 90.3).

33. *See Coghill v. Coghill*, 836 P.2d 921, 926 (Alaska 1992) (stating that trial court has discretion to choose method best approximating obligor's future earning capacity on basis of most complete evidence before it).

34. *See Zimin v. Zimin*, 837 P.2d 118, 122 (Alaska 1992) ("It is the duty of the parties, not the court, to ensure that all necessary evidence is presented at trial."); *Koller*, 71 P.3d at 804 n. 7 (noting superior court has discretion to use evidence submitted to it).

maintain accurate bookkeeping, and that the accountant who did his taxes was a friend. Curtis's current wife, Sandy McDonald, also testified that her husband "wasn't the best bookkeeper."

We also reject Curtis's contention that the court should have first determined his income for the year 2000 and ordered that amount to be used for each of his past years' arrearages. He relies on *Duffus v. Duffus*,[35] a case where we found that in looking back to calculate an obligor's income for the previous ten years, and "considering the inherent difficulties of accurately reconstructing parental income over this lengthy period," an annual recalculation of support was impractical.[36] Instead, we held that "once [the obligor's] first year support obligation has been accurately calculated based on his actual adjusted income, the superior court may maintain that amount of support unchanged for subsequent years."[37] While Judge Tan relied on current average wage rates in approximating Curtis's past income, the use of this figure was plainly reasonable for the purpose of calculating the first year of Curtis's support obligation. Curtis testified that when he performed excavation work nearly fifteen years ago he was paid twenty dollars an hour, a figure equal to the figure the court used. Moreover, in light of the unreliable evidence Curtis presented, it would have been extraordinarily difficult, if not practically impossible, for the court to recreate the information necessary to obtain a more precise determination of Curtis's past income. We conclude that the court's determination on Curtis's income was not error.

**F. The Court Did Not Err in Establishing Curtis's Support Obligation and in Refusing To Reduce His 2005–2006 Support Obligation.**

■ Curtis claims that the court erred in refusing to reduce his 2005–2006 support ob-

ligation because of disability. He contends that a knee injury rendered him incapable of performing anything but sedentary work, that there was no evidence in the record that he worked in 2005, and that his prospective support obligation should therefore have been varied for "good cause." For the reasons set forth below, we reject both Curtis's belated and largely conclusory arguments regarding his lack of income in 2005 as well as his argument that the court should have reduced his ongoing support obligation on account of disability.

■ As already discussed, in determining the appropriate level of child support due under Civil Rule 90.3, the court generally bases its calculations on the annual adjusted income of the obligor parent.[38] In determining a party's earning capacity for purposes of the rule, the trial court has the discretion to choose the best indicator of future earning capacity based on the evidence before it.[39] The ultimate goal of a support determination "is to arrive at an income figure reflective of economic reality."[40] Rule 90.3(c) provides that the court may vary a support award for good cause; however we "will not relieve a noncustodial parent from his child support obligations absent an affirmative showing that the obligor parent cannot meet this obligation."[41]

Judge Tan refused to reduce Curtis's support obligation on account of his alleged disability based on his finding that:

> apparently [Curtis] continues to go on[ ] and work and do a lot of jobs, and although there may be an operation in the offing, the doctor's notes suggest that, you know, he really shouldn't be working, but he still continues to do so—I'm going to have to impute an income to you.

After Judge Tan issued his findings, Curtis's counsel argued that Curtis's business had been closed for a year but admitted that

---

**35.** 72 P.3d 313 (Alaska 2003).

**36.** *Id.* at 321.

**37.** *Id.*

**38.** *Kowalski v. Kowalski,* 806 P.2d 1368, 1370 (Alaska 1991).

**39.** *Coghill v. Coghill,* 836 P.2d 921, 926 (Alaska 1992).

**40.** *Adrian v. Adrian,* 838 P.2d 808, 811 (Alaska 1992).

**41.** *Kowalski,* 806 P.2d at 1371.

Curtis may have failed to adduce evidence to that effect.

Curtis's evidence of his alleged disability consisted largely of his own testimony. He testified that he "blew ... out" his ACL ten years before trial and had been receiving injections into his knee to help him get around, that he would need a knee replacement in the future, and that he often wore a knee brace. He testified that he could no longer work on heavy equipment and could only do light-duty work "up until a year ago." He testified that shortly after Christmas 2004 he had a snow machine accident and "blew [his] knee apart," that from late December 2004 on he could perform only limited work, and that his doctor ordered that he be "totally off work" from October 2006 (when Curtis suggested he might undergo knee surgery) until January 1, 2007.

However, contrary evidence indicates that Curtis's knee problems did not preclude him from working. He admitted to being able to maintain work over the last fourteen years despite his knee problems and testified that he continued to go snow machining with his son and stay "pretty active." His wife testified that Curtis was still able to go four-wheeling. And while Curtis testified that he could not work on heavy equipment because his knee was so susceptible to injury, he later explained that when he worked at his shop he would "climb ladders and climb inside and get underneath [the motor homes and vehicles]."

We have previously rejected a trial court's order holding in abeyance a party's support obligation based on its decision that the party could no longer work as a carpenter where there was "no testimony by a physician regarding the nature or extent of the [obligor's] injuries and disability."[42] In this case Curtis presented scant evidence of the nature of his injury. Neither of the one-page forms he produced from the Anchorage Fracture &

Orthopedic Clinic contained any formal diagnosis or specific comments on Curtis's injury. Curtis did not call a physician to testify nor did he offer any further medical documentation on the existence or extent of his injury.

Moreover, Curtis's contention that his support obligation should be reduced because there was "no evidence" that he worked in 2005 reverses the burden of proof and is otherwise suspect. Curtis, who had worked continuously for years, never testified that he was unemployed in 2005 and in fact testified that he was then in the process of buying a home. In addition, at the time of the hearing in April 2006, Curtis testified that he was selling his shop, which would "be sold [by] this summer," suggesting that he may have continued to work. And Curtis's counsel contended that Curtis's average income had been about $25,000 "over the years from 2000 *until present.*" Finally, to the extent that Curtis was not working, he made no showing of other job or training opportunities that he had been actively pursuing such that he might have been found to be reasonably underemployed.

In sum, the evidence established that Curtis had worked *at least* up until 2004 and that he had historically been capable of working despite his knee injury.[43] Given the lack of medical evidence on the nature and extent of Curtis's injury, the court could have reasonably determined that he was not disabled and selected a wage figure of twenty dollars per hour as a reasonable approximation of Curtis's earning capacity.[44] While Civil Rule 90.3(c)(1) permits a court to vary support calculations, it does so only "upon proof by clear and convincing evidence that manifest injustice would result" without a variance. Curtis has failed to offer sufficient evidence, through further evidence of his medical disability or of his personal financial straits, that such manifest injustice would result in

42. *Houger v. Houger,* 449 P.2d 766, 769–70 (Alaska 1969).

43. *See Dunn v. Dunn,* 952 P.2d 268, 271 (Alaska 1998) (upholding court's determination to impute income despite party's testimony of shoulder pain where evidence established party continued to build houses).

44. *See Virgin v. Virgin,* 990 P.2d 1040, 1049 (Alaska 1999) (holding court not obligated to credit speculative testimony that party's income likely to decline).

his case.[45] We therefore conclude that the superior court decision establishing Curtis's prospective support obligation was reasonable.[46]

### G. The Award of Attorney's Fees Was Not an Abuse of Discretion.

Curtis's final argument is that the court improperly awarded Yvonne attorney's fees. The court awarded Yvonne thirty percent of her attorney's fees pursuant to Civil Rule 82(b)(2) and AS 25.24.140(a)(1).

■ While attorney's fees are customarily awarded to the prevailing party under Civil Rule 82, there is an established exception to the rule in divorce cases which bases fee awards on the relative economic situation and earning powers of the parties.[47] "The divorce exception to Civil Rule 82 is based on a broad reading of AS 25.24.140(a)(1) [pertaining to an interim award of attorney's fees in divorce cases] ..., and on the reality that there is usually no prevailing party in a divorce case."[48]

■ Curtis contends that Yvonne was not entitled to fees under Rule 82 or the divorce exception and that the court should have looked to AS 25.20.115,[49] which provides for attorney's fee awards in custody and visitation matters, and should have considered the "relative resources of the parties" in determining whether to make an award. We need not address Curtis's statutory argument because he wholly failed to raise the issue of whether AS 25.20.115 applies to fee awards in a child support action until his appellate reply brief.[50]

■ We further conclude that, based upon Curtis's own concession that "[t]he facts in this case do not resemble a divorce," the divorce exception does not apply. In light of the inapplicability of the divorce exception, the court's award of fees pursuant to Civil Rule 82(b)(2)[51] was not in error.

## V. CONCLUSION

Because Curtis asked the superior court to decide each year of his child support obligation, he waived his right to assert collateral estoppel. He also precluded the administrative decision from taking effect and for that reason we hold that the superior court order was not an impermissible retroactive modification of child support. Because the superior court's determinations regarding Curtis's income and Yvonne's primary physical custody of Gideon were supported by the evidence, we AFFIRM the superior court's support award. Because the evidence also supports the court's determination that Curtis was not entitled to a reduction in support payments on account of his disability, we

45. *Coats v. Finn,* 779 P.2d 775, 777 (Alaska 1989) (holding that burden of persuasion for departure from Civil Rule 90.3(c) is on objecting party).

46. Curtis remains free to petition the superior court for modification "if he can show that he is unable to earn the income level determined by the superior court and, thus, cannot meet his support obligation." *Renfro v. Renfro,* 848 P.2d 830, 833 (Alaska 1993).

47. *Koller v. Reft,* 71 P.3d 800, 808 (Alaska 2003); *but see Sanders v. Barth,* 12 P.3d 766, 768–69 (Alaska 2000) (refusing to apply divorce exception for support issue litigated more than ten years after end of relationship).

48. *Koller,* 71 P.3d at 808 (quoting *B.J. v. J.D.,* 950 P.2d 113, 118 (Alaska 1997)). AS 25.24.140(a)(1) provides: "During the pendency of [a divorce] action, a spouse may ... be awarded expenses, including ... attorney fees and costs...."

49. AS 25.20.115 provides:

In an action to modify, vacate, or enforce that part of an order providing for custody of a child or visitation with a child, the court may, upon request of a party, award attorney's fees and costs of the action. In awarding attorney fees and costs under this section, the court shall consider the relative financial resources of the parties and whether the parties have acted in good faith.

50. *Childs v. Tulin,* 799 P.2d 1338, 1341 n. 5 (Alaska 1990) (issue raised for first time in reply brief deemed waived).

51. Rule 82(b)(2) states in relevant part: "In cases in which the prevailing party recovers no money judgment, the court shall award the prevailing party in a case which goes to trial 30 percent of the prevailing party's reasonable actual attorney's fees which were necessarily incurred...."

AFFIRM the decision of the superior court and the award of attorney's fees.

BRYNER, Justice, not participating.