Michael A. BEAUDOIN, Appellant,

v.

Georgia R. BEAUDOIN, Appellee.

Nos. S–8885, S–9324.

Supreme Court of Alaska.

June 15, 2001.

**524**

Peggy A. Roston, Law Office of Peggy A. Roston, Anchorage, for Appellant.

Georgia R. Beaudoin, pro se, Wasilla.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

### I. INTRODUCTION

Five years after dissolving their marriage, Georgia and Michael Beaudoin modified their child custody agreement. Under the original custody order Georgia had sole custody of the couple's three children; as a full-time parent she did not have a job outside the home. Under the new agreement Michael became the primary custodian: he took sole custody of one child and shared equal custody of the other two on an alternating-week schedule. After the superior court approved this agreement, Michael moved for an order establishing Georgia's support obligation. Contending that Georgia was voluntarily underemployed, he asked the court to impute Georgia's income based on her earning capacity. The court denied these requests without an evidentiary hearing, ruling that, since Georgia had never held a paying job and her situation remained unchanged, the undisputed evidence failed to establish voluntary underemployment. We reverse. Because Michael offered evidence that Georgia was employable but chose not to work, Michael's claim of voluntary underemployment required an evidentiary hearing.

### II. FACTS AND PROCEEDINGS

Michael and Georgia Beaudoin dissolved their marriage on August 21, 1992. They initially agreed to joint legal and physical custody of their three children Jason, Joshua, and Laura,[1] but in October 1993 modified the arrangement to give Georgia primary physical custody of all three children. Over the next four years—from 1993 through 1997—Georgia acted as Joshua and Laura's primary caregiver; Georgia was also Jason's primary caregiver until he moved in with Michael in November 1996. During this period, Georgia was involved in a relationship with a man named Cleve Coyne. Although she and Coyne did not marry, Georgia referred to Coyne as her husband; she and the children lived with Coyne in his home, and together they acted as a family unit. Georgia helped Coyne run a part-time, home-based landscaping and snowplowing business, holding herself out to be a co-owner. But despite her participation in this business, she intended to make herself available to her children "at all times" and did not look for employment outside the home.

In late 1997 Michael and Georgia reached a new custody agreement. Under the new agreement, Michael took sole legal and physical custody of their oldest son, Jason; Michael and Georgia shared legal and physical custody of Joshua and Laura equally, on a week-on, week-off basis. The parties agreed that child support would be governed by the shared custody formula in Alaska Civil Rule 90.3(b). The superior court approved the parties' agreement in November 1997.

The following month, Michael moved for entry of a child support order conforming to the new custody arrangement. Specifically, he asked the court to calculate Georgia's support obligation according to her earning capacity rather than her earning history. Because Georgia was no longer the primary custodial parent and because Michael now had sole custody of Jason and shared custody of Joshua and Laura, Michael insisted that Georgia's duty of support required her to seek suitable employment or be treated as voluntarily underemployed.

In support of his claim that Georgia was capable of gainful employment but was voluntarily underemployed, Michael pointed out

---

1. Jason was born on May 14, 1980; Joshua was born on January 17, 1982; and Laura was born on March 7, 1987.

that Georgia's dissolution petition had listed her occupation as salesperson and her annual gross income as $14,627, that Georgia had admitted earning a $7,581 net annual income at the time of the dissolution, that she had steadily worked without pay in Coyne's business since the time of dissolution, that Coyne had estimated that the work she performed for his business was worth at least $7 per hour, that Georgia held herself out to be a co-owner of the business, and that her friends described her as a businesswoman who devoted substantial time to the business. In addition, Michael submitted a report by a vocational counselor who predicted, based on the type of work that Georgia reportedly performed for Coyne, that she would be able to find work paying around $15 to $16 per hour. Relying on this offer of evidence, Michael requested a hearing to establish Georgia's earning capacity.

Georgia opposed Michael's motion, stating that her only recent job experience was helping Coyne with seasonal work for no pay and that she did not believe herself capable of finding work for "anywhere near $12.00 per hour on a full time basis." Georgia insisted, moreover, that she had no intention of seeking employment: "When the children were born, Michael and I jointly agreed that I should be a full-time mom. I intend to continue to make myself available for the children at all times." According to Georgia, Michael's claim of voluntary underemployment simply reflected resentment: "I believe Michael is jealous that I have so much time to devote to the children.... I believe he is trying to force me to work, because he has to."

After reviewing Alaska cases on voluntary underemployment, the superior court denied Michael's request to impute income to Georgia; the court also denied Michael's request for a hearing. In the court's view, the undisputed facts precluded a finding of voluntary underemployment; they established, as a matter of law, that Georgia had a right to do "what she has been doing" and had no duty to look for gainful employment:

[T]he key consideration as the court understands the case law is whether there has been some change in [Georgia's] circumstances that indicates that she is voluntarily underemployed. [Michael] has pointed to no facts in dispute to demonstrate any such change in circumstances. He does not dispute that her primary focus is her children when they are with her, that she has worked in the plowing and landscaping business since its inception, or that her plan is to continue to work in the business and to focus on her children. In short, there is no factual dispute that [Georgia] is continuing to do what she has been doing. In light of the fact that [Michael] has not presented any legal argument or case law holding that a person who continues to do what she has always been doing must have income imputed to her because she might be able to find a paying job somewhere else, the court concludes that there are no *material* facts in dispute as they relate to the imputation of income.

Since there are no material facts in dispute, no hearing is required.

After both parties moved for reconsideration, the court reaffirmed its ruling, emphasizing its conclusion that Georgia's loss of primary custody did not materially change her circumstances:

The court believes that because [Georgia] has the children every other week, her circumstances have not materially changed for purposes of imputing income. While she has some time to herself that she did not previously have, the fact remains that she has decided to focus on the children during the extensive period of time when she has them, which is precisely the decision she has made ever since she had children.

The court further reasoned that imputing income to Georgia would have the undesirable consequence of reducing the overall amount of available child support payments.

Accordingly, the court issued a child support order calculated on the assumption that Georgia would continue to focus her life on the children and would not be gainfully em-

ployed.[2] Michael appealed.

Several months later, Georgia terminated her relationship with Coyne, moved out of his home, and began working part-time as a waitress. Michael moved to modify the 1998 support order and renewed his claim of voluntary underemployment, asking the court impute income to Georgia based on full-time employment. After considering several rounds of additional pleadings, the court found that, even if it imputed full-time earnings to Georgia at her current hourly wages, the resulting change to its 1998 child support order would not meet Civil Rule 90.3's presumptive threshold for modification.[3] Accordingly, the court denied Michael's motion. Michael then filed a new appeal, which we consolidated with his first appeal for purposes of disposition.

## III. *DISCUSSION*

### A. *Standard of Review*

An award of child support is subject to reversal only if the trial court abuses its discretion or applies an incorrect legal standard.[4] We will find an abuse of discretion when our review of the record leaves us with a "definite and firm conviction based on the record as a whole that a mistake has been made."[5] Whether the trial court has applied the correct legal standard in making its child support determination is a question of law that we review independently.[6] We also use independent review to determine if the trial court erred in denying a motion for an evidentiary hearing.[7]

### B. *Michael's Request for a Hearing on His Claim of Voluntary Underemployment Should Have Been Granted.*

#### 1. *Michael made a prima facie showing of voluntary underemployment.*

Michael argues that the trial court erred by denying his request for an evidentiary hearing to establish whether Georgia was underemployed. Michael's right to a hearing is governed by well-settled precedent. Because conflicting affidavits and exhibits seldom provide a meaningful basis for resolving factual disputes,[8] we have recognized that evidentiary hearings on motions to modify child support will generally be needed when the pleadings raise genuine issues of material fact.[9] In the present case, then, the critical question is whether Michael raised genuine issues of material fact concerning his claim that Georgia was voluntarily underemployed.

Michael's underemployment claim arose from the parties' 1997 agreement to modify their existing custody agreement; the new custody agreement, in turn, necessitated a reexamination of the parties' child support obligations. Under the prior arrangement, Georgia had primary physical custody of all three children. Upon implementing the new agreement, however, Michael assumed primary physical custody of Jason and shared custody of Joshua and Laura. The change left Georgia with half-time custody of two children instead of full-time custody of three children, thereby triggering Rule 90.3(b)'s provisions governing shared and divided custody situations and making it necessary to establish Georgia's child support obligation.

---

2. Specifically, the court assigned Georgia the minimum monthly payment of $50—an amount reflecting the assumption that Georgia's adjusted annual income would fall below the federal poverty guideline—which resulted in Michael paying support of $893 a month for two children. *See* Alaska R. Civ. P. 90.3(b)(1).

3. *See* Alaska R. Civ. P. 90.3(h)(1) (material change in circumstances warranting modification of child support is presumed if support calculated under Rule 90.3 would vary more than 15% from the outstanding support order).

4. *Sanders v. Sanders*, 902 P.2d 310, 313 (Alaska 1995).

5. *Kowalski v. Kowalski*, 806 P.2d 1368, 1370 (Alaska 1991).

6. *See Marine v. Marine*, 957 P.2d 314, 316 (Alaska 1998).

7. *See Acevedo v. Burley*, 944 P.2d 473, 476 n. 2 (Alaska 1997).

8. *See Adrian v. Adrian*, 838 P.2d 808, 812 (Alaska 1992).

9. *Cf. Epperson v. Epperson*, 835 P.2d 451, 453 (Alaska 1992).

At the time of the parties' agreement for modification of custody, the commentary to Rule 90.3 provided that annual income could be imputed to a parent for purposes of calculating child support in cases of voluntary underemployment:

The court may calculate child support based on a determination of the potential income of a parent who voluntarily is unemployed or underemployed. A determination of potential income may not be made for a parent who is physically or mentally incapacitated, or who is caring for a child under two years of age to whom the parents owe a joint legal responsibility. Potential income will be based upon the parent's work history, qualifications and job opportunities. The court also may impute potential income for non-income or low income producing assets.[10]

Relying on this provision, Michael argued that the court should impute income to Georgia because she was no longer a full-time custodian. Michael pointed out that she now owed the children a duty of support while they were in his custody. He contended that she therefore could not reasonably refuse to seek gainful employment. In support of this argument, Michael offered evidence indicating that Georgia had previously held a job, that she was capable of obtaining gainful employment, and that she was actually working without pay in Coyne's business.

In response, Georgia minimized the amount of time she worked for Coyne's business and expressed doubts about her ability to find a job outside the home. But she acknowledged that she had not looked for another job and insisted that she had a right to continue living as if she still had full-time custody of the children: "When the children were born, Michael and I jointly agreed that I should be a full-time mom. I intend to continue to make myself available for the children at all times."

■ Considering Michael's proffered evidence of Georgia's ability to find gainful employment and Georgia's stated intent to continue being "a full-time mom" despite having only one-third of the total custody time, we find that Michael raised a material dispute on the issue of Georgia's voluntary underemployment. This showing would normally suffice to require an evidentiary hearing.

2. *The record does not conclusively preclude Michael's claim.*

In denying a hearing on voluntary underemployment, however, the superior court found three reasons to reject Michael's claim as a matter of law: (1) Alaska case law disfavors finding voluntary underemployment absent a history of gainful employment; (2) Michael failed to establish any change in Georgia's circumstances to support a finding of voluntary underemployment; and (3) a finding of voluntary underemployment would have the damaging effect of reducing the amount of available child support. Our consideration of these reasons leads us to conclude that they do not support the court's decision to reject Michael's claim without a hearing.

a. *Alaska underemployment decisions do not bar Michael's claim.*

The superior court identified three situations in which our case law has found voluntary underemployment. In *Kowalski v. Kowalski,* we reviewed a finding of voluntary underemployment on the part of a noncustodial father who had held various short-term construction jobs before marrying but had failed to maintain similar employment after marrying.[11] Noting that the father had failed to establish his current earning capacity or show that his unemployment was invol-

---

10. Former Alaska R. Civ. P. 90.3 cmt. III.C at 226. In 1997 this language appeared only in the commentary to Rule 90.3. It has subsequently been embodied in the text of Rule 90.3 as subparagraph (a)(4), and the rule's commentary has been revised to direct courts to consider the "totality of the circumstances" in deciding whether to impute income. *See* Alaska R. Civ. P. 90.3 cmt. III.C at 246.

11. 806 P.2d 1368, 1370 & n. 2 (Alaska 1991); *see also Dunn v. Dunn,* 952 P.2d 268, 269, 271 (Alaska 1998) (affirming imputed income for a noncustodial father who took early retirement shortly after marriage and chose not to return to work after divorcing).

untary, we affirmed the superior court's finding. We emphasized that "[w]e will not relieve a noncustodial parent from his child support obligations absent an affirmative showing that the obligor parent cannot meet this obligation." [12]

In *Pugil v. Cogar*, after divorcing, a noncustodial father moved out of state where he planned to change to a lower-paying occupation.[13] We affirmed a decision to impute income based on his history of earnings as a fisherman during the marriage, finding that the trial court had correctly considered all relevant circumstances in resolving the tension between locking the father into an established career and burdening the mother and child with his choice of a new, lower-paying career.[14]

Finally, in *Nass v. Seaton*, we upheld a decision imputing earnings to a noncustodial father who had a history of substantial earnings during the marriage but had not fully advertised his services after divorcing.[15]

The superior court found a common thread uniting these cases: "[P]rior to the litigation, the obligor had a clearly defined track record of employment and earnings, but his employment or wages changed in a manner that led the court to believe that the reduction was voluntary." Concluding that "prior employment was a critical element of the court's ability to determine whether the obligor was voluntarily underemployed," the court declined to impute income to Georgia, who had no history of prior earnings.

██ But this ruling effectively converted a repeating fact pattern into a "critical element" of voluntary underemployment. Although prior employment can be an important factor in measuring underemployment,[16] our cases do not suggest that it is an indispensable element. To the contrary, the relevant inquiry under Civil Rule 90.3 is simply whether a parent's current situation and earnings reflect a voluntary and unreasonable decision to earn less than the parent is capable of earning.[17] Civil Rule 90.3(a)(4) only bars a finding of voluntary underemployment in two situations: when the underemployed parent "is physically or mentally incapacitated" or "is caring for a child under two years of age to whom the parents owe a joint legal responsibility." [18] In all other situations, the rule and our case law specifically require courts to consider the "totality of the circumstances" to decide whether income should be imputed.[19]

In summary, then, neither Rule 90.3 nor our case law supports the superior court's threshold legal assumption that a "track record of employment and earnings" is a "critical element" in the absence of which there is "no baseline from which to measure the extent to which [Georgia] [was] voluntarily underemployed."

The superior court also distinguished Georgia's situation from that in *Kowalski* by pointing out that she was not a "non-custodial parent" because, although one child lived full-time with Michael, she shared equal custody of the parties' other two children. But in addressing the issue of voluntary underemployment, Civil Rule 90.3 does not distinguish between situations involving primary

---

**12.** *Kowalski*, 806 P.2d at 1371; *see also Pattee v. Pattee*, 744 P.2d 658, 659, 662 (Alaska 1987), *overruled on other grounds in Nass v. Seaton*, 904 P.2d 412 (Alaska 1995) (reversing trial court's decision to base support obligation on father's actual income after he quit work to become a student).

**13.** 811 P.2d 1062, 1064 (Alaska 1991).

**14.** *See id.* at 1066–67. These circumstances included the needs of the child; the ability of the custodial parent to meet those needs; the father's work history as a commercial fisherman and welder; his qualifications; his job opportunities; and his plans for education. *See id.* at 1066.

**15.** *See* 904 P.2d at 417–18 (remanding for other reasons).

**16.** *Cf.* Alaska R. Civ. P. 90.3 cmt. III.E at 247 ("determination of future income may be especially difficult when the obligor has had very erratic income in the past"); *Nass*, 904 P.2d at 417–19 (recognizing this difficulty); *Kowalski*, 806 P.2d at 1372 (same).

**17.** *See* Alaska R. Civ. P. 90.3(a)(4) & cmt. III.C at 246.

**18.** *Id.*

**19.** Alaska R. Civ. P. 90.3 cmt. III.C at 246; *Pugil*, 811 P.2d at 1066.

custody and those involving shared or divided custody. Subparagraph (a)(4) of Rule 90.3 expressly addresses voluntary underemployment in the context of primary custody situations. But this concept carries over to shared and divided custody situations, since Rule 90.3(b)'s provisions governing shared and divided custody require the court to begin its child support determination by calculating the individual support obligations of both parents under Rule 90.3(a). And while the bulk of our voluntary underemployment cases deals with primary custody situations, our discussion of the subject in those cases accords no special significance to that form of custody.[20]

> b. *Because the parties' new custody agreement altered Georgia's duty of support, Michael did not need to prove additional changes in circumstances affecting Georgia's employment.*

Although it stopped short of holding that voluntary underemployment can never be found in the absence of a showing of prior gainful employment, the superior court declared that, without such a showing, Michael needed to prove some comparable change in Georgia's circumstances. Unless Michael showed that Georgia "*changed* her employment or lifestyle," the court reasoned, "the fact that [she] might be able to find a paying job in lieu of continuing to work in the family business and focusing on her children when they are staying with her does not mean that she thereby is voluntarily underemployed." To the contrary, "the available facts indicate that she continues to do what she has always done: to make the raising of her children her primary focus.... There being no change, it is difficult to conclude that [she] is voluntarily underemployed."

But the court's reasoning overlooks the crucial significance of the parties' agreement to modify their existing custody arrangement. By virtue of the 1997 custody agreement, Georgia changed her parental role from that of a full-time custodian of three children to that of a half-time custodian of Laura, age 10, and Joshua, age 15. For his part, Michael undertook to share equal custody of Laura and Joshua with Georgia and to assume sole physical custody of Jason, age 17. This arrangement necessarily lessened the demands on Georgia as a parent, because it essentially made Michael responsible for two-thirds of the children's total physical custody. Yet despite this change from sole physical custody to one-third custody, Georgia insisted on continuing to play her usual role as "a full-time mom," denying any intention to shift her efforts toward supporting the children while they were in Michael's care.

Given these circumstances, we believe that Michael's claim of voluntary and unreasonable underemployment was facially plausible and should not have been rejected as a matter of law for failure to establish a more direct change in Georgia's "employment or lifestyle." Georgia's desire to continue in her accustomed role is certainly understandable. But standing alone, it is not a self-evidently reasonable basis for refusing to support her children during their substantial time in Michael's care.[21] Moreover, the need for an evidentiary hearing was particularly great because Michael offered substantial evidence indicating that Georgia would be capable of earning significant wages.

 Without further justification, then, Georgia's decision not to look for employment outside the home, even though she shared only one-third of the total responsibility for her children's physical custody raised genuine issues of material fact as to whether

**20.** Indeed, in an opinion published after the superior court issued its decision in the present case, we affirmed a finding of voluntary underemployment in a shared custody situation. *See Lacher v. Lacher,* 993 P.2d 413, 417, 423 (Alaska 1999).

**21.** *Cf. In re Marriage of Wright,* 78 Wash.App. 230, 896 P.2d 735, 737 (1995):

> Although this court is sympathetic to the significant difficulties faced by a single parent, we have held that voluntary under-employment by either parent will not shield that parent from a child support obligation. This principle applies with equal force to men and women, regardless of the reason for the under-employment.
> (Citation omitted.)

she was "voluntarily and unreasonably" underemployed.[22]

### c. The possibility that a finding of underemployment might reduce Michael's child support payments to Georgia did not justify summary denial of his motion.

The superior court identified one additional "final and absolutely key other consideration" warranting summary rejection of Michael's voluntary underemployment claim:

> One might argue—as [Michael] implicitly does—that a parent with week-on, week-off custody still has an obligation to support her children and that she should not evade that obligation by being voluntarily under employed. But in this case, due to the manner in which child support is calculated, imputation of income will actually *reduce* the support available to the children. . . .

> Imputation of income is an appropriate course to take when a non-custodial parent, who bears the full expense of child support, chooses not to work; for it ensures that children will receive the financial support that that parent ordinarily should be able to provide. But under the facts of this case, imputation of income accomplishes the reverse result, for [Georgia] is assumed to make money she actually is not making and hence is not using to support the children. Rather, imputation of income here can only reduce [Michael's] obligation, thereby reducing the actual monetary support that the children will receive.

■ This final reason for rejecting Michael's claim is problematic. It assumes that an order imputing income to Georgia would not encourage her to find a paying job.[23] Yet this is not a fair assumption. An important reason—if not the chief reason—for imputing income to a voluntarily underemployed parent is to goad the parent into full employment by attaching an unpleasant consequence (a mounting child support debt or, in certain cases of shared custody, a reduced child support payment) to continued inaction. Indeed, in primary and shared custody situations alike, an order imputing income often yields no tangible benefits to the children unless and until it impels the underemployed parent to find a job. To this extent, then, our rule allowing courts to impute income in cases of voluntary underemployment depends on the very premise that the superior court rejected here-the likelihood that an order imputing income to Georgia would spur her to find a paying job.

### 3. Michael's claim must be remanded for an evidentiary hearing.

Given our conclusion that Michael made a prima facie showing of voluntary underemployment and that his claim could not be rejected as a matter of law, we must vacate the superior court's 1998 child support order and remand this case for entry of a modified order after an evidentiary hearing on Michael's claim. In remanding for further proceedings, however, we emphasize the narrow basis of our decision. We have recognized that Michael is entitled to an evidentiary hearing because he has made out a prima facie showing of voluntary underemployment. But we express no opinion as to the ultimate validity of his claim. Nor do we attempt to define the boundaries of underemployment. We leave these issues to the superior court's sound discretion on remand.

■ We do think it important, however, to observe that Rule 90.3(a)(4) does not rigorously command pursuit of maximum earnings. The rule's more modest objective is to give courts broad discretion to impute income based on realistic estimates of earning potential in cases of voluntary and *unreasonable* unemployment or underemployment. We note that courts in other jurisdictions have varied widely in interpreting and enforcing similar provisions.[24] In our view, the

---

**22.** *See* Alaska R. Civ. P. 90.3(a)(4).

**23.** The superior court expressly relied on this assumption, stating that it was not "aware of any legal authority that would allow the court to

enter ... an order" requiring Georgia to "obtain a paying job."

**24.** *Compare, e.g., In re Marriage of Braun,* 887 S.W.2d 776, 779 (Mo.App.1994) (affirming trial court's decision not to impute income to wife

boundaries of Alaska's rule are best left to be defined through case-by-case consideration based on the totality of relevant circumstances.[25]

We further note that our decision vacating the 1998 child support order makes it unnecessary to address the issues arising on appeal from the superior court's 1999 orders denying Michael's second generation of modification motions. Since the superior court will be able to base its reconsideration of the original child support order on the parties' current circumstances and their actual earnings since 1997, the intervening events of the second appeal will necessarily be subsumed in the court's ruling on its original order.[26]

## IV. CONCLUSION

The superior court's 1998 orders denying Michael's motion for a hearing on voluntary underemployment and establishing his child support obligation are VACATED. This case is REMANDED for further proceedings as directed in this opinion.

who was unemployed during eight-year marriage, had only a high school education and minimal work history, and was awarded primary physical custody of three young children), and *Castaneda v. Castaneda*, 615 N.E.2d 467, 471 (Ind.App.1993) (affirming trial court's decision not to impute full-time income to mother who had been working part-time since the birth of her first child and wished to remain part-time until the youngest of three children started school), *with In re Marriage of Jonas*, 57 Wash.App. 339, 788 P.2d 12, 13 (1990) (imputing income to mother who chose to stay home with children, explaining: "No matter how legitimate their reasons ... each [parent] is accountable for earnings foregone in making the choice to be unemployed."), *In re Marriage of LaBass*, 56 Cal. App.4th 1331, 66 Cal.Rptr.2d 393, 397–98 (1997) (affirming trial court's decision to impute full-time teacher's salary to mother who had chosen to work part-time to spend time with children where she was qualified to work and after-school child care was available), *Terpstra v. Terpstra*, 588 N.E.2d 592, 594–95 (Ind.App.1992) (imputing full-time income to mother even though she claimed consistent part-time work history where two of children would be in school and wages

covered child care), and *Brody v. Brody*, 16 Va. App. 647, 432 S.E.2d 20, 22 (1993) (income may be imputed if children are in school, child care is available, and cost of child care can be determined).

25. *See generally Pugil*, 811 P.2d at 1066–67 (finding that trial court had considered all the relevant factors in imputing income to underemployed custodial parent); *Terpstra*, 588 N.E.2d at 594–95 (emphasizing that factors applied in determining whether to impute full-time income to stay-at-home parent are necessarily case-specific).

26. Because changed circumstances occurring after entry of the 1998 child support order led Georgia to obtain gainful-albeit part-time—employment, we believe that, for periods of actual employment, the superior court should begin by assuming Georgia's earnings accurately reflect reasonable efforts to maintain employment at earning capacity; the court should depart from this assumption only to the extent that Michael makes out a prima facie showing of voluntary and unreasonable underemployment.