NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JAZMIN BOONE,<br><br>    Appellant,<br><br>    v.<br><br>JONATHAN BOONE,<br><br>    Appellee. | Supreme Court No. S-18412<br><br>Superior Court No. 4FA-17-01670 CI<br><br>MEMORANDUM OPINION<br>AND JUDGMENT*<br><br>No. 1978 – August 2, 2023 |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Earl A. Peterson, Judge.

Appearances: Amy Schrum, Golden Heart Law, LLC, Fairbanks, for Appellant. Christopher Smith, Law Offices of Blake Fulton Quackenbush, Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I.    INTRODUCTION

A father filed for a child custody modification in anticipation of his move from Fairbanks to Georgia. The father requested custody of the child during the school year in Georgia, with summer visits to the child's mother in Fairbanks. The mother objected, arguing that the child would have greater stability remaining in Fairbanks. The superior court found that the child would experience greater stability with the father

---

\*       Entered under Alaska Appellate Rule 214.

in Georgia and that the father's willingness to foster a relationship with the mother weighed in his favor, and granted the father primary physical custody of the child when he moved to Georgia.

The mother appeals, challenging the factual findings underlying the court's custody order. The mother also challenges two aspects of the support order: that the parents split educational and extracurricular expenses in addition to child support payments and that the father would solely claim the child as a dependent on federal income taxes. We reverse the superior court's order on educational and extracurricular expenses as an abuse of discretion, but affirm in all other respects.

## II.    FACTS AND PROCEEDINGS

### A.    Family History

Jazmin Boone and Jonathan Boone share one daughter together, born in 2013. The couple, who lived with their daughter in Fairbanks, dissolved their marriage in October 2017. Both parents remained in Fairbanks at the time, and they agreed to joint legal and shared physical custody of the child, alternating physical custody weekly. Jonathan continued to live in the apartment the family had shared. Jazmin moved frequently, living in five different locations with various roommates and a boyfriend over the course of a year. Since November 2018, however, she has lived in a two-bedroom duplex. Jazmin's sister moved into the duplex for almost a year, but by September 2021, only Jazmin and the child lived there.

The child's schooling varied, as the parents have not always been able to agree about the child's education. For kindergarten in 2018-19, the child was homeschooled. Starting in the fall of 2019, Jonathan enrolled the child in a public elementary school. Jonathan did not want the child to be homeschooled because his work schedule did not allow it and Jazmin's work at a fire camp prevented the child from starting the school year on time. Jonathan also reported that the child had not actually finished the kindergarten assignments for the previous home school year. The

child remained at the same elementary school for first and second grades, but transferred to another school for third grade.

The child was often tardy to school while in Jazmin's care. She was tardy 40 times in 2019-20, and 9 by December 2021. The reasons for her lateness varied. During the first year, the child was often tardy because, according to Jazmin, she was upset in the mornings due to concerns about being bullied. More recently, the explanations ranged from a death in the family to car trouble.

The child's after-school care has also varied. The child participated in taekwondo and in community theater in Fairbanks. From May 2021 to February 2022, the child had six different babysitters, but starting in early 2022 Jazmin's younger sister usually watched the child.

The child had negative experiences with some of the caregivers Jazmin retained. In one instance, the child's finger was accidentally caught in a doorway at a caregiver's house. Jazmin took the child to the emergency room and part of her finger had to be removed. That caregiver's daughter also verbally and physically abused the child, so Jazmin stopped sending the child to that caregiver. The child also told her parents she was uncomfortable with being watched by one of her other caregivers.

As the parties would later point out, the child experienced additional incidents of instability in her parents' households. In 2019 Jazmin was working at a fire camp and did not return to care for the child as scheduled. Meanwhile Jonathan ended a serious relationship with a girlfriend with whom the child had been close.

### B. Jonathan's Move To Georgia And The Resulting Custody Proceeding

In July 2020 Jonathan petitioned to change the custody arrangement because he planned to move to Georgia to pursue a college degree and better job opportunities. In his motion to modify custody, Jonathan requested that the child live with him during the school year and return to Alaska for the summer and during other school breaks. Jazmin opposed the motion, arguing that remaining in Fairbanks year-round would provide the child with greater stability. After mediation failed, the

superior court held seven hearings, beginning in May 2021 and continuing through February 2022.

In the midst of those hearings, during the summer of 2021, Jonathan moved to Georgia, where he lived with his partner and her three children. Jonathan was enrolled in college and arranged his classes to align with the children's school schedule so he could be home when they were. Additionally, Jonathan's partner worked from home and was available to support the children. In October 2021 Jonathan's partner gave birth to twins.

### 1. The parties' communication challenges

Following Jonathan's move the parties struggled with communication and visitation. For example, after Jonathan left, Jazmin arranged for therapy for the child without consulting Jonathan. And although Jazmin facilitated visits to Georgia in August and November of 2021, Jonathan testified that Jazmin was generally uncooperative with long distance co-parenting. Numerous text messages between the parties demonstrate their difficulties in arranging visitation. Among other challenges, Jazmin wanted Jonathan to send her a notarized letter stating that he would send the child back to Fairbanks before she would facilitate a short visit. Further text messages demonstrated that Jazmin did not cooperate with Jonathan in trying to schedule a spring break visit in March 2022.

Both parties acknowledged the struggles in communication and co-parenting. Jazmin asked the court to help them create a communication schedule. In July 2021 Jazmin decided she would respond to "non[-]time[-]sensitive inquiries [from Jonathan] on Wednesdays and Sundays," but then failed to respond to messages on those days. Jazmin also would not respond to messages from Jonathan for several days or answer when he called.

According to Jonathan he also regularly experienced difficulty contacting the child. While he was consistent in trying to contact the child each day, she was often unavailable. Jonathan also testified that the child's devices were often not charged,

frustrating communication.  Text messages from that summer indicate that there were times when Jonathan could not contact the child for a week at a time.  At some point, Jonathan's partner's phone number was blocked on the child's tablet, but Jazmin claimed not to know how that happened.  Jonathan testified that these issues continued to persist for months after he moved to Georgia.

### 2.    Additional witnesses

Both Jonathan and Jazmin called family members and friends who testified that they were generally good parents.  The child's therapist also testified, explaining that she had been working with the child since July 2021 and that the child had anxiety around change.  While the therapist thought that the potential move caused some stress and anxiety for the child, she also noted that the child had changed her mind about the move and what she wanted several times.

### 3.    The superior court's findings

The court first found that Jonathan's move was legitimate, because he "moved to be with his partner and other children."  Next, the court analyzed what custody arrangement would serve the child's best interests per the factors outlined in AS 25.24.150(c).[1]  The superior court examined each factor and found that most factors were neutral or did not apply.  The court conducted a symmetrical analysis, examining both what would happen if the child remained primarily with Jazmin in Fairbanks and what would happen if the child moved with Jonathan to Georgia.[2]

Two factors weighed in favor of the child moving with Jonathan.  The superior court found that the factor regarding each parent's stability and their respective

---

[1]    When considering a custody modification, the same statutory factors apply as in the original custody determination.  AS 25.20.110(g).  The custody statute lists nine factors the court must consider. *See* AS 25.24.150(c).

[2]    *See Moeller-Prokosch v. Prokosch* (*Moeller-Prokosch III*), 99 P.3d 531, 535-36 (Alaska 2004) (requiring trial courts to symmetrically analyze consequences for child of parent's relocation).

environments favored Jonathan. The court emphasized that the "instability in [the child's] after-school care, while in Jazmin's custody," as well as Jazmin's "differing testimony" about the child's issues with school tardiness raised concern that "Jazmin's home is not as stable as she alleges." The court described the many caregivers the child had over time, as well as the child's discomfort with at least one of those caregivers and the fact that the child suffered harm in a separate caregiver's home. Ultimately the court found that both parents could provide a stable home, but that Jonathan consistently had been able to provide a more stable environment for the child.

The superior court also found that the factor regarding each parent's willingness to facilitate a continued relationship with the other weighed in favor of Jonathan. The court found that Jazmin had ignored messages from Jonathan about issues regarding the child's education, that she ignored his calls, and that she did not facilitate regular communications between Jonathan and the child. Considering each parent's testimony, the superior court found Jonathan to be credible, noting that despite having "several opportunities to critique Jazmin's parenting," Jonathan approached parenting issues kindly and calmly. On the other hand, the court found that Jazmin was "quick to critique Jonathan and was seemingly unwilling[] to communicate with Jonathan." The court found that Jonathan was more likely and able than Jazmin to facilitate the child's relationship with her other parent.

Based on these considerations the court determined that it was in the child's best interests to move to Georgia with Jonathan. While the child was "generally happy and successful" in Alaska, the court found that Jonathan would offer a more stable home and would facilitate the child's relationship with Jazmin. The court further noted that living in Georgia would put the child closer to her half- and step-siblings and a "potentially more supportive environment."

The court granted Jonathan primary physical custody of the child while the parties live in separate communities, with Jazmin receiving a long summer break visit, plus visits during some holidays and spring break. The court also noted that if

Jazmin decided to move to be closer to Jonathan, the parties would then share 50/50 physical custody.  The court updated the child support order and ordered that the parents shall "equally split" the expenses associated with the child's schooling and extracurricular activities.  Finally, the court ordered that Jonathan would claim the child as a dependent for tax purposes.

Jazmin appeals.

## III. STANDARD OF REVIEW

"Superior courts are vested with 'broad discretion' in making child custody decisions."[3]  We will reverse a superior court's custody order only if the record shows an abuse of discretion or if controlling factual findings are clearly erroneous.[4]  "The superior court abuses its discretion when it assigns too much weight to some factors while ignoring others, fails to consider statutorily mandated factors, elevates the parents' interests above the child's, or considers impermissible factors."[5]  A factual finding is clearly erroneous when a review of the entire record leaves us "with a definite and firm conviction that a mistake has been made."[6]  We give particular deference to factual findings based "primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence."[7]

"We reverse child support awards only if the superior court abused its discretion or applied an incorrect legal standard."[8]  Whether the superior court applied

---

[3]     *Pingree v. Cossette*, 424 P.3d 371, 376 (Alaska 2018) (citing *Vachon v. Pugliese*, 931 P.2d 371, 375 (Alaska 1996)).

[4]     *Id.* at 376-77.

[5]     *Id.* at 377 (first citing *Vachon*, 931 P.2d at 375; and then citing *Chesser v. Chesser-Witmer*, 178 P.3d 1154, 1157 (Alaska 2008)).

[6]     *Id.* (quoting *Millette v. Millette*, 177 P.3d 258, 261 (Alaska 2008)).

[7]     *Id.* (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011)).

[8]     *Koller v. Reft*, 71 P.3d 800, 804 (Alaska 2003) (citing *Beaudoin v. Beaudoin*, 24 P.3d 523, 526 (Alaska 2001)).

the right legal standard in making its child support determination is a question of law that we review using our independent judgment.[9] We review the allocation of federal tax exemptions for abuse of discretion.[10]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion When It Granted Jonathan Primary Physical Custody.

When a custody dispute involves one parent's plan to leave the state, the superior court must use a two-step process to determine the best interests of the affected child.[11] First, the court must determine whether the planned move is legitimate, and second, assuming that the move will take place, the court must consider the statutory factors to determine the custody arrangement that will serve the best interests of the child.[12] "Performing the best interests analysis based on [a parent's] assumed move requires symmetric consideration of the consequences to [the child] both if [the parent] leaves with [the child] and if [the parent] leaves without [the child]."[13]

Jazmin challenges the court's findings related to two factors: the stability and continuity the child would experience with each parent and each parent's willingness and ability to foster a relationship with the other parent. She contends that the court abused its discretion in granting Jonathan primary custody given its reliance on clearly erroneous factual findings. We see no clear error or abuse of discretion, and we therefore affirm the overall custody order.

---

[9] *Id.*

[10] *Skinner v. Hagberg*, 183 P.3d 486, 489, 492 (Alaska 2008).

[11] *Saffir v. Wheeler*, 436 P.3d 1009, 1013 (Alaska 2019) (citing *Moeller-Prokosch v. Prokosch* (*Moeller-Prokosch I*), 27 P.3d 314, 316 (Alaska 2001)).

[12] *Id.* (first citing *Mengisteab v. Oates*, 425 P.3d 80, 85 (Alaska 2018); and then citing *Veselsky v. Veselsky*, 113 P.3d 629, 632 (Alaska 2005)).

[13] *Id.* (alterations in original) (quoting *Moeller-Prokosch III*, 99 P.3d 531, 535-36 (Alaska 2004)).

**1. The superior court did not clearly err in finding that Jonathan provided greater stability.**

Jazmin argues that the court focused improperly on after-school care and ignored the greater stability of the child remaining in Fairbanks. Reviewing the entire record and the court's findings, we conclude that the court did not clearly err in finding that this factor favored Jonathan.

Under this factor the court must consider "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity."[14] When one parent is moving from Alaska, this factor requires the court to consider both the desirability of maintaining geographical continuity, but also maximizing relational stability.[15] The moving parent may offer greater emotional stability than the non-moving parent,[16] and thus geographic continuity does not always outweigh relational stability.[17]

Relational stability includes social and emotional factors. Most generally, relational stability looks at which parent is most likely to provide an emotionally stable environment for the child.[18] Courts can consider the time and energy parents have to invest in their child in making this analysis.[19] The superior court can also consider the child's relationship with extended family, like grandparents or half- or step-siblings.[20]

---

[14]     AS 25.24.150(c)(5).

[15]     *Saffir*, 436 P.3d at 1013 (quoting *Chesser-Witmer v. Chesser*, 117 P.3d 711, 719 (Alaska 2005)); *see also Meier v. Cloud*, 34 P.3d 1274, 1279 (Alaska 2001).

[16]     *Veselsky*, 113 P.3d at 635.

[17]     *Id.* ("[S]tability is often a function of parental attitude and not of geography." (quoting *McQuade v. McQuade*, 901 P.2d 421, 426 (Alaska 1995))).

[18]     *Andrea C. v. Marcus K.*, 355 P.3d 521, 529 (Alaska 2015).

[19]     *See Blanton v. Yourkowski*, 180 P.3d 948, 953, 955 (Alaska 2008).

[20]     *See Rego v. Rego*, 259 P.3d 447, 458 (Alaska 2011).

Geographic stability includes, of course, stability of place.[21] But it is also a holistic inquiry, looking at the child's school, community of friends and family, and cultural community.[22]

The court must evaluate both prospective and retrospective stability,[23] evaluating both the time that the child has lived in a stable environment and which parent can better provide a stable and supportive environment moving forward.[24] "The real question on appeal is whether the court engaged in a 'comprehensive inquiry into each parent's respective ability to maintain stable and satisfactory relations between themselves and the child.' "[25]

Here, the court acknowledged that "[b]oth parents have provided [the child] with a stable home" and could do so going forward. Despite this, the court found that Jonathan provided a more stable environment, based on two main facts: the instability in the child's after-school care when she was with Jazmin, including that at least one caregiver made the child uncomfortable; and Jazmin's shifting and contradictory explanations about the child's tardiness to school. The court also noted later in the findings that in Georgia, the child "[would] have siblings and a potentially more supportive environment."

As an initial matter, we disagree with Jazmin's argument that the court improperly focused on after-school care. Had the court found this factor favored Jonathan *solely* due to Jazmin's need for a variety of caregivers for the child, the finding would have been clearly erroneous. Parents routinely face challenges in finding

---

[21]     *Barrett v. Alguire*, 35 P.3d 1, 9 (Alaska 2001).

[22]     *Id.* at 9-11.

[23]     *Meier v. Cloud*, 34 P.3d 1274, 1279 (Alaska 2001).

[24]     *Id.*

[25]     *Andrea C. v. Marcus K.*, 355 P.3d 521, 529 (Alaska 2015) (quoting *Meier*, 34 P.3d at 1279).

consistent care for their children, and it is not unusual for parents to rely on multiple caregivers to meet their children's needs. But that was not the court's concern here. Rather, there was evidence that Jazmin's choice of caregivers at times created an unstable and even harmful environment for the child. The child's caregivers changed numerous times, sometimes in quick succession. And the court found that at least two of those caregivers either harmed the child or made her feel uncomfortable. Further, the court considered many facts in making its determination, such as school tardiness and unreliable explanations for that tardiness during Jazmin's time, and compared these with the "more stable home" Jonathan offered. In a symmetrical analysis, this evidence supported finding a relative lack of stability in Jazmin's home.

Jazmin next suggests that the court did not consider the geographic stability inherent in keeping the child primarily in Fairbanks. We disagree. The court's findings reflect sufficient consideration of this aspect of stability. The court expressly found that Jazmin had provided and could continue to provide a stable, satisfactory home in Fairbanks. But in its symmetrical analysis, the court also found that the interest in maintaining continuity for the child in a stable environment "actually weighs in favor of Jonathan" because Jonathan's move to Georgia was legitimate, and because the child's life with Jazmin in Fairbanks was not as stable as her life with Jonathan would be. In addition to Jazmin exposing the child to caregivers that made her uncomfortable, the court recognized that Jazmin moved multiple times and had different roommates over time, and the child's elementary school setting changed three times. Altogether, the court's findings reflect sufficient consideration of factors related to geographical stability.

After considering all the evidence, the court found that both parents provided stable homes, but after-school care and the child's unexplained tardiness with Jazmine tipped the balance in favor of Jonathan. The court did not clearly err in finding that the child would experience greater stability moving to Georgia with Jonathan than she would remaining primarily in Fairbanks.

**2.** **The superior court did not clearly err in finding that Jonathan was more willing and able to foster the child's relationship with Jazmin.**

Jazmin argues that the superior court overlooked testimony indicating that Jazmin was willing, despite difficulties, to facilitate communication between Jonathan and their child. She contends that this factor should either weigh in her favor or be considered neutral. Although some of the testimony and evidence presented during the parties' custody hearing suggested that Jazmin was capable of fostering the child's relationship with Jonathan, there was also significant evidence that she struggled in that regard. We see no clear error in the court's overall finding.

Among the factors that the court must consider in conducting a best interests analysis is "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child."[26] We have emphasized the heightened importance of this factor when parents live in different states: "It is essential to have a custodial parent willing to foster an open relationship with the other parent when a great distance separates the children from the non-custodial parent."[27] In considering this factor, the superior court is able to consider both the parents' past behavior and their courtroom demeanor, placing it in the best position to observe the parents' relationship and how they interact.[28]

Here, the court found that this factor favored Jonathan. First noting that Jonathan "expressed a desire to communicate with Jazmin to co-parent," the court then found that Jazmin "wants to limit and reduce communication between Jonathan" and the child, as demonstrated on many occasions. The court noted that Jazmin had been

---

[26] AS 25.24.150(c)(6).

[27] *Blanton v. Yourkowski*, 180 P.3d 948, 951 (Alaska 2008) (quoting *Silvan v. Alcina,* 105 P.3d 117, 121 (Alaska 2005)).

[28] *Brett M. v. Amanda M.*, 445 P.3d 1005, 1013 (Alaska 2019).

inconsistent in her communication about things like parent-teacher conferences and spring break visits, and generally left Jonathan "in the dark."

Overall, ample evidence in the record supports these findings. Jonathan testified about feeling frustrated that he did not always know the child's schedule and that her devices often were not charged so he could not reach her. He submitted numerous text messages as exhibits indicating that he sometimes could not speak with the child for a week at a time, and that Jazmin would not respond to messages for several days or pick up the phone when he called. Jonathan testified that these issues persisted well into October 2021, months after he left Alaska.

Importantly, the court found that Jonathan's testimony on this point was credible. On the other hand, the court found Jazmin's testimony on facilitating communication was not credible, noting that she was "seemingly unwilling[] to communicate with Jonathan."

Jazmin argues that the court's finding that Jonathan would better facilitate a relationship is clearly erroneous. First, she points to the evidence of times when she worked to facilitate the relationship between Jonathan and the child, including when Jazmin called Jonathan after the child had an emergency, and when Jazmin facilitated visits to Georgia in August 2021 and in November 2021. Jazmin also concedes that there was one time she failed to respond to a text about a parent-teacher conference, but argues it was Jonathan's responsibility to engage with the child's school calendar.

In general, we do not consider these points persuasive. Calling the other parent after an emergency is the minimum of what must be expected in a co-parenting relationship. And although it is true that Jazmin facilitated at least two visits for the child to Georgia, numerous text messages between the parties show that the August visit came after months of back and forth between Jazmin and Jonathan, with Jazmin often not cooperating with Jonathan. Additionally, Jonathan submitted text messages about scheduling a spring break visit for the child in March 2022, which once again demonstrated a lack of cooperation by Jazmin. These, and other examples of Jazmin's

seeming unwillingness to communicate with Jonathan and to ensure he could communicate with the child, support the court's factual findings.

Deferring to the court's credibility determination,[29] and in light of the evidence supporting the court's factual finding, we see no clear error. We affirm the court's award of primary custody to Jonathan as within the court's broad discretion.

**B.    Ordering The Parents To Split Educational And Extracurricular Expenses In Addition To Child Support Payments Without Explanation Was An Abuse Of Discretion.**

Jazmin argues that the superior court abused its discretion in ordering that the parents split educational and extracurricular costs in addition to her payment of child support pursuant to Alaska Civil Rule 90.3.[30] We agree, and reverse this section of the child support order.

When one parent is awarded primary physical custody, child support is calculated as a percentage of the adjusted annual income of the non-custodial parent, according to Rule 90.3.[31] A court may vary the standard award if there is "proof by clear and convincing evidence that manifest injustice would result" from the standard award.[32] If a court varies the award, it must provide the reason in writing.[33] A parent requesting the change must present evidence supporting the variation.[34]

---

[29]    *See id.*

[30]    Alaska R. Civ. P. 90.3(a). We also note one other minor contradiction in the superior court's custody order. The superior court ordered that Jonathan should be "responsible" for the child's transportation for some visitation, but also ordered that the parties split visitation travel expenses "50%/50%." At a future hearing, it may be helpful to clarify what "responsible" means in this context, particularly considering the parties' previous challenges agreeing to visitation.

[31]    *Id.*

[32]    Alaska R. Civ. P. 90.3(c)(1).

[33]    *Id.*

[34]    Alaska R. Civ. P. 90.3 cmt. VI.A.

Here, the court ordered the parents to "equally split" the child's educational and extracurricular expenses. The court ordered this split in addition to the child support award that the court calculated under Rule 90.3. These additional costs are a variation from the standard Rule 90.3 support award, because a Rule 90.3 child support award incorporates consideration of expenses normally associated with raising a child, including educational expenses.[35]

The court did not indicate that it found an exception under Rule 90.3(c), nor provide justification for this variation, as the Rule requires.[36] Additionally, there is no support in the record to justify the variation, such as extraordinary educational needs or extracurricular expenses. Moreover, we note that Jonathan did not request a deviation or provide any evidence that would support such a change.[37]

An order of equally shared educational and extracurricular expenses, in addition to payment of child support calculated under Rule 90.3, constitutes a deviation from the standard child support award, and here, there are no findings to justify such a deviation. We therefore conclude that it was an abuse of discretion to require that Jazmin share the child's educational and extracurricular expenses beyond the child support she paid under Rule 90.3, and we reverse the relevant portion of the court's child support order.

C.    **The Superior Court Did Not Abuse Its Discretion When It Authorized Jonathan Alone to Claim The Child As A Dependent.**

Jazmin's final challenge is to the superior court's allocation of the federal tax deduction to Jonathan. We hold that the court did not abuse its discretion in making that allocation.

---

[35]    *Cf. Money v. Money*, 852 P.2d 1158, 1164-65 (Alaska 1993) (noting that child support only requires contribution for reasonable needs, not extraneous or questionable expenses like summer hockey camp).

[36]    Alaska R. Civ. P. 90.3(c)(1).

[37]    Alaska R. Civ. P. 90.3 cmt. VI.A.

The court may allocate the dependent tax deduction for each child between the parties as is just and proper, in the child's best interests, and consistent with AS 25.24.152 and federal law.[38] Under AS 25.24.152, the court "may grant a noncustodial parent the right to claim a child as a dependent under federal tax laws for a tax year if the noncustodial parent satisfies the requirements of federal law."[39] Federal law permits a noncustodial parent to claim the child only if the custodial parent declares in writing they will not claim the child as a dependent that year.[40] Both Alaska and federal law define the custodial parent as the parent who has physical custody for more time during the year.[41] The court has discretion to grant a noncustodial parent the federal income tax deduction,[42] but nothing in the statute or Civil Rule 90.3 requires it.

Here, the court ordered that Jonathan shall claim the child as a dependent for tax purposes. The court did not explain this decision, but we assume that the court chose this allocation because it was granting Jonathan primary physical custody such that he would be the custodial parent under state and federal law.[43] Given the change in custody in light of Jonathan's move, it was reasonable for the court to accordingly

---

[38] Alaska R. Civ. P. 90.3(k).

[39] AS 25.24.152(a).

[40] 26 U.S.C. § 152(e)(2).

[41] AS 25.24.152(b); 26 U.S.C. § 152(e)(4).

[42] *Skinner v. Hagberg*, 183 P.3d 486, 492-93 (Alaska 2008) (finding no abuse of discretion when superior court allocated federal income tax deduction to noncustodial father while mother was not in workforce).

[43] *See Nancy M. v. John M.*, 308 P.3d 1130, 1138 (Alaska 2013) (holding that detailed findings were unnecessary for income tax deduction allocation to father with clear evidence that father will have majority of physical custody).

modify the allocation of the federal income tax deduction.[44] The court did not abuse its discretion in allocating the federal income tax deduction to Jonathan.

## V.     CONCLUSION

We REVERSE the superior court's support order that the parents equally split educational and extracurricular activities.  We AFFIRM the superior court's custody and child support orders in all other respects.

---

[44]     While Jazmin correctly notes that neither party petitioned for the change, parties are on notice that the child support order will change with a significant change in physical custody.  Jazmin also correctly notes that if the parties were to live in the same location and resume their prior shared custody schedule, this allocation may become unfair.  But should this change occur, the court would need to revisit child support and Jazmin could raise the issue then.